Harold W. Dickens, III SBN 276082
**Law Office of Harold W. Dickens, III**
1650 Arlington Ave. #3
Los Angeles, CA 90019
Telephone No. (310) 709-3031

Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JOHN DOE, an individual; JANE DOE, an individual,** | Case No.: |
| **Plaintiffs,** | **COMPLAINT FOR NEGLIGENCE; GROSS NEGLIGENCE; INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS; ASSAULT AND BATTERY; TRESPASS TO REAL PROPERTY; TRESPASS TO CHATTELS; STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES** |
| **vs.** | |
| **LOCKHEED MARTIN, a Maryland corporation; DOES 1-50, inclusive,** | |
| **Defendants** | **DEMAND FOR JURY TRIAL** |

## JURISDICTION

1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship and an amount in controversy greater than $75,000.

## VENUE

2.     Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to this complaint occurred in this district.

## PARTIES

3.     Plaintiff, John Doe, (hereinafter "Plaintiff John Doe"), is and at all times herein mentioned was a citizen of the United States. Plaintiff John Doe is a

resident of Riverside County, California and has been a resident of California since about May of 1985.

4.     Plaintiff, Jane Doe, (hereinafter "Plaintiff Jane Doe"), is and at all times herein mentioned was a citizen of the United States. Plaintiff Jane Doe is a resident of Riverside County, California and has been a resident of California since about March of 1986.

5.     Defendant Lockheed Martin (hereinafter "Defendant Lockheed Martin"), is a global defense, security, and aerospace company based in Bethesda, Maryland, and has major operations in California and throughout the world. The company operates in five segments: Aeronautics, Information Systems & Global Solutions, Missiles and Fire Control, Mission Systems and Training, and Space Systems. Last year, Defendant Lockheed Martin had revenue of over $45,000,000,000.

6.     Plaintiffs, being ignorant of the true names and capacities of Defendants, Does 1-50, therefore sue those Defendants by such fictitious names. Plaintiffs are informed and believe and thereon allege that each Defendant so named is responsible in some manner for the injuries and damages sustained by Plaintiffs as set forth herein. Plaintiff will amend this complaint to state the names and capacities of DOES 1-50, inclusive, when they have been ascertained.

7.     Plaintiffs alleged that each of the Defendant DOES 1-50 was the agent, employee, director, officer, member, partner, joint venture, owner shareholder, principal, successor, or predecessor in interest of the remaining Defendants. In doing the things alleged below, each Defendant was acting within the course and scope of his agency, employment, directorship, capacity as an officer, member, partner, joint venture, owner, shareholder, principal, successor, or predecessor in interest of the remaining Defendants. Plaintiffs further allege that the acts and conduct attributed to each Defendant were approved, ratified, authorized, and known to the remaining Defendants, and each of them.

COMPLAINT FOR NEGLIGENCE; GROSS NEGLIGENCE; IIED; ASSAULT; BATTERY; TRESPASS; STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES

1

## STATUTE OF LIMITATIONS TOLLED

2     8.     Pursuant to the Continuing Tort Doctrine, a claim for a continuing tort

3  does not accrue until the tortious conduct ceases.

4     9.     The recurring wrongful conduct of Defendants, as alleged herein, has

5  been repeated over a period of time and has not ceased, which constitutes a

6  continuing tort.

7     10.    Furthermore, the statute of limitations should be equitably tolled

8  because Defendants' actions prevented Plaintiffs from bringing earlier suit.

9

## BOYLE V. UNITED TECHNOLOGIES CORP. DOES NOT APPLY

10    11.    *Boyle v. United Technologies Corp.* (1988) 487 U.S. 500, does not

11  apply here because there is no evidence that: (1) the United States approved

12  reasonably precise specifications; (2) the equipment conformed to those

13  specifications; and (3) the supplier warned the United States about the dangers in

14  the use of the equipment that were known to the supplied but not to the United

15  States. Also, the nature of this suit does not question the design of the weapons in

16  question, and the weapons are not being used in combat but rather are being used

17  criminally against innocent civilians.

18

## INTRODUCTION

19    12.    Plaintiffs complain, inter alia, of extremely dangerous and accurate

20  offensive space based weaponry that was designed, deployed, and is being

21  maintained and operated by a network of individuals wherein Defendant Lockheed

22  Martin is the main non-government entity.

23    13.    "Co-conspirators" as used hereinafter refers to some members of the

24  National Reconnaissance Agency ("NRO"), the Central Intelligence Agency

25  ("CIA"), Congress, and any other individuals or organizations that conspired with

26  Defendant Lockheed Martin to design, build, deploy, or operate the satellite

27  weapons described in this complaint.

28

COMPLAINT FOR NEGLIGENCE; GROSS NEGLIGENCE; IIED; ASSAULT; BATTERY; TRESPASS;
STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES

14.    In or around the early 1960s, the Defendants and co-conspirators secretly designed satellites that had the capability to see through walls and through roof-tops, and this information has been kept secret ever since. These satellites have the capability, which is an integral part of their design, to beam invisible and penetrating beams onto and into homes, buildings, aircraft, vehicles, etc.

15.    Defendants and co-conspirators have since used propaganda and deceit to trick the public into thinking that surveillance satellites only have the capability to see outside.

16.    Defendants and co-conspirators never mentioned to the public that they could beam invisible and penetrating satellite-to-ground lasers into and onto buildings, homes, people, etc. This invisible beaming capability is also present in a more scattered and weakened intensity in many communication satellites, radio and television broadcasting satellites, and in many ground based devices.

17.    Throughout the decades this see-through satellite technology has evolved, in secrecy, and has been used mainly for illicit purposes. One of these purposes has been to study us by peering into, and beaming invisible electromagnetic signals into our habitats and our bodies. Information about these super-secret weapons and the innocent citizens being assaulted by them has been documented on hundreds of websites and in many books and articles.

18.    In order to fulfill a physiological need that the Defendants and/or their co-conspirators have, they must develop an open parasite/host relationship with some individuals. Plaintiff John Doe is one of those individuals, and there are others claiming to be victims of this technology as well.

19.    The Defendants and/or their co-conspirators remotely use a global grid of satellite weaponry to track and see into the Plaintiffs' home, vehicles, work places, etc. The same grid of satellites can and are being used constantly to deploy a barrage of space-to-ground invisible, penetrating electromagnetic beams and lasers of differing frequencies and intensities.

COMPLAINT FOR NEGLIGENCE; GROSS NEGLIGENCE; IIED; ASSAULT; BATTERY; TRESPASS; STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES

20.   The satellite-to-ground weaponry is being used by the Defendants and/or their co-conspirators, with malice, to cause damages to Plaintiff John Doe including, but not limited to, the following: things so personal and traumatizing Plaintiff John Doe fears speaking about them; isolation; loss of affection of family and friends; injury to Plaintiffs' family; attacks by microwave frequencies causing bodily overheating and burns; fear of exposure to cancer from the electromagnetic frequencies; assault; fear of assault by invisible lasers on internal and external organs; anxiety, discomfort, and annoyance; harm from assault and battery; nausea and vertigo; loss of peace of mind; injury and impairment of physical health; emotional distress; mental anguish; very low quality of life; deprivation of enjoyment of property; loss of freedom; loss of privacy; extreme deprivation of sleep; deprivation of sexual enjoyment; extreme destruction of private property; extreme financial losses; and loss of control of thought, speech, bodily functions, decision making, etc.

21.   Plaintiff Jane Doe has incurred damages including, but not limited to: isolation; loss of affection of family and friends; injury to Plaintiffs' family; attacks by microwave frequencies causing bodily overheating; assault; fear of assault by invisible lasers; induced compulsive behavior; sleep deprivation; invasion of privacy; extreme financial losses; very low quality of life; loss of consortium; and loss of control over her thoughts and decision making.

## STATEMENT OF THE CASE

22.   The development of the weapons being used against Plaintiffs began in or around 1950 and was funded over decades by a massive Cold War budget. The Cold War lasted from about 1947 to 1991.

23.   In or around the early 1950s Defendant Lockheed Martin was the main surveillance entity in the United States, and soon thereafter became the best surveillance entity in the world.

COMPLAINT FOR NEGLIGENCE; GROSS NEGLIGENCE; IIED; ASSAULT; BATTERY; TRESPASS;
STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES

24.     On information and belief the weapons being used against Plaintiffs were developed and deployed in utmost secrecy, mainly by a networking triage of organizations which included Defendant Lockheed Martin, the CIA, and the NRO.

25.     The CIA has a long history of illegal experimentation, namely the well-known program MK-ULTRA which lasted from the early 1950s until the early 1970s. During this program the CIA used numerous methodologies to manipulate people's mental states, including the surreptitious administration of drugs such as LSD and other chemicals, hypnosis, sensory deprivation, isolation, verbal and sexual abuse, as well as other forms of torture.

26.     The scope of the MK-ULTRA project was broad, with research undertaken at over 80 institutions, including 44 colleges and universities, as well as hospitals, prisons, and pharmaceutical companies. (*80 Institutions Used in CIA Mind Studies*, Horrock, Nicholas M. (4 Aug. 1977) New York Times). Most of the documentation for this program was destroyed by the CIA.

27.     MK-ULTRA was documented proof that the CIA was desperate to find a means of controlling the behavior of other individuals. Doing so by remotely controlled, invisible satellite-to-ground beams was much more obscure and effective. Defendant Lockheed Martin was the only satellite company in the world that was in the position to and had the necessary resources to accomplish this goal.

28.     MK-ULTRA had over 149 subprojects, such as Subproject 119 which was formally launched in 1960. The purpose of this subproject was to research, study, and interpret "bioelectric signals from the human organism, and activation of human behavior by remote means." (Memorandum for the Record re MKULTRA Subproject 119 from Technical Services Division, Research Branch, CIA (Aug. 17, 1960)). Other subprojects also concerned remote behavior control.

29.     On information and belief, Plaintiffs allege that the CIA and/or Defendant Lockheed Martin and/or co-conspirators did eventually decide to go with remote satellite-to-skull and satellite-to-body mind control and behavior

COMPLAINT FOR NEGLIGENCE; GROSS NEGLIGENCE; IIED; ASSAULT; BATTERY; TRESPASS; STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES

control. During this period, Defendant Lockheed Martin was the best positioned entity on the planet to design, build, operate, and deploy such satellite technology.

30.     Initially, the main purpose of the National Reconnaissance Program was to spy on the Soviet Union. Even before the NRO was formed in 1960, Defendant Lockheed Martin had become the most powerful surveillance institution on the planet. Its division called Lockheed Missiles & Space Co. ("LMSC") developed the most sophisticated surveillance weapons of the era. The weapons included high-altitude aircraft such as the U-2, A-12 OXCART and the CORONA satellite imagery programs.

31.     The U-2 enabled the CIA to scrutinize Soviet capabilities from 70,000 feet, leading to discoveries that dispelled concerns within the U.S. government of a "bomber gap" or "missile gap." This intelligence led to the cancellation of defense programs that were intended to counter those perceived gaps, ultimately saving the government billions of dollars. (Publication from the Central Intelligence Agency, Office of Public Affairs (Sept. 2013) "*Profiles in Leadership: Directors of the Central Intelligence Agency, 1947*").

32.     This fact was echoed in 1967 by President Lyndon B. Johnson who famously said: "We've spent $35 or $40 billion on the space program. And if nothing else had come out of it except the knowledge we gained from space photography, it would be worth ten times what the whole program has cost. Because tonight we know how many missiles the enemy has and, it turned out, our guesses were way off. We were doing things we didn't need to do. We were building things we didn't need to build. We were harboring fears we didn't need to harbor." (*How the US Built its Super Secret Spy Satellites Program*, Tarantola, Andrew (23 April 2013) GIZ EXPLAINS).

33.     These two comments show that, at this point in and around the mid-1960s, the United States had already succeeded in gaining military and space supremacy over the Soviet Union.

COMPLAINT FOR NEGLIGENCE; GROSS NEGLIGENCE; IIED; ASSAULT; BATTERY; TRESPASS;
STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES

34.     During this period, the NRO and Defendant Lockheed Martin's Space Program were highly entangled and almost indistinguishable. This is evident from the history of NRO leadership. Mr. James Plummer worked for LMSC, mainly in high ranking positions from 1955 to 1973, before becoming the Under Secretary of the Air Force and Director of the NRO from 1973 to 1976. He then returned to LMCS where he was the Executive Vice President until 1979. (*Directors of the National Reconnaissance Office at 50 Years* (July 2011) Center for the Study of National Reconnaissance).

35.     This timeframe when Mr. Plummer moved from Lockheed to the NRO, and then back to Lockheed, was the same period during which the space-to-ground terror weapons were documented to have been developed.

36.     The NRO had been in operation for decades before its existence was revealed in 1992. Even now, information on the early satellites is sparse and anything after 1972 is non-existent except for a few photos taken by the KH-11 satellite which were leaked to Jane's Defense Weekly in 1985. (Tarantola, 2013).

37.     A 1996 bipartisan commission report described the NRO as having by far the largest budget of any intelligence agency, and "virtually no federal workforce," accomplishing most of its work through "tens of thousands" of defense contractor personnel. (*Chapter 13: The Cost of Intelligence,* Preparing for the 21st Century: An Appraisal of U.S. Intelligence (1 March 1996) Commission on the Roles and Capabilities of the United States Intelligence Community).

38.     By far, the main contractor and satellite builder for the NRO is Defendant Lockheed Martin. Defendant Lockheed Martin designs, builds, deploys, maintains, and operates NRO's satellites. NRO's directors often have ties to Defendant Lockheed Martin.

39.     In a comprehensive article about Defendant Lockheed Martin that was published in the New York Times in 2004, Danielle Brian of the Project on Government Oversight was quoted as saying, "It's impossible to tell where the

COMPLAINT FOR NEGLIGENCE; GROSS NEGLIGENCE; IIED; ASSAULT; BATTERY; TRESPASS; STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES

government ends and Lockheed begins. The fox isn't guarding the henhouse. He lives there. (Weiner, Tim, *Lockheed and the Future of Warfare*, New York Times November 28, 2004). The article went on to state that men who have worked, lobbied, and lawyered for Defendant Lockheed Martin hold the posts of Secretary of the Navy, Secretary of Transportation, Director of the National Nuclear Weapons Complex, and Director of the National Spy Satellite Agency. The list also includes Stephen J. Hadley, who has been named the next National Security Advisor to the President.

40.     For almost a decade before Mr. Plummer's tenure as the Director of the NRO, the U.S. had already known that the Soviets were no longer a threat. Lockheed Martin, the CIA, and the NRO were still receiving significant funding for the Cold-War weapons development for about 25 years thereafter.

41.     In or around 1960, Defendant Lockheed Martin, the NRO, the CIA, and/or other conspirators knew that the next step in the evolution of surveillance was to be able to see inside buildings. After all, this is where the majority of information is hidden. Plaintiffs allege on information and belief that Defendants accomplished this task in the 1960s and have kept it a secret ever since. Plaintiffs also allege that the Defendants conspired over many years to keep remote satellite-to-person beaming, point-in-time tracking which could be used to find any criminal on the planet, and other vital satellite technology away from the public.

42.     In his famous January 17, 1961 farewell address President Dwight Eisenhower clearly saw something that he was deeply concerned about when he warned about the military-industrial complex. The military-industrial complex is a type of iron triangle in which the armed forces and arms industry has a controlling influence on politics and industry in general. He stated, "This conjunction of an immense military establishment and a large arms industry is new in the American experience. The total influence — economic, political, even spiritual — is felt in every city, every statehouse, every office of the federal government. We recognize

COMPLAINT FOR NEGLIGENCE; GROSS NEGLIGENCE; IIED; ASSAULT; BATTERY; TRESPASS; STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES

the imperative need for this development. Yet we must not fail to comprehend its grave implications. Our toil, resources and livelihood are all involved; so is the very structure of our society. In the councils of government, we must guard against the acquisition of unwarranted influence, whether sought or unsought, by the military–industrial complex. The potential for the disastrous rise of misplaced power exists, and will persist. We must never let the weight of this combination endanger our liberties or democratic processes. We should take nothing for granted." This warning went unheeded and Defendant Lockheed Martin and its co-conspirators secretly developed a highly accurate, invisible, and remote ability to create undue influence and assault on all other aspects of society.

43.   To this day, Defendant Lockheed Martin designs, deploys, and maintains terrestrial radar imaging reconnaissance satellites that can peer through cloud cover, ground, walls, etc. Invisible space-to-ground beams are an integral part of these types of satellites, evidencing that Defendant Lockheed Martin is familiar with this technology.

44.   Defendant Lockheed Martin has known about, and been heavily involved with, the construction, maintenance, and deployment of the very satellite technology that has plagued and injured Plaintiffs and many others. The Defendant has admitted to having remote mind reading and mind control technology. Plaintiff is informed and believes that the voluntary admissions by the Defendant were not met to inform the public but to deceive and to skew timelines of past capabilities.

45.   Much of Defendant Lockheed Martin's past research and technology developments in these areas have never been made public. Defendant Lockheed Martin and its co-conspirators put out deceiving information to the public with the goal of making victims such as Plaintiff John Doe seem as though they are merely psychotic conspiracy theorists.

46.   Defendant Lockheed Martin knew all aspects of the invisible electromagnetic spectrum and how to engineer and deploy satellite signals that

COMPLAINT FOR NEGLIGENCE; GROSS NEGLIGENCE; IIED; ASSAULT; BATTERY; TRESPASS; STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES

could easily be transformed into concentrated, invisible, penetrating beams of different frequencies and intensities. This technology is an inherent part of radar imaging satellites, which are known to have see-through capabilities.

47.    Defendant Lockheed Martin knew that this technology could be used against human beings on the ground, and had a duty to put safeguards into place protecting the public from such powerful and invisible weaponry.

48.    Defendant Lockheed Martin and its co-conspirators used this satellite technology to not only see into buildings, but also to track individuals and using the invisible satellite-to-ground lasers and beams to commit assault and battery on these individuals.   They also used the technology to see inside world markets and predict rises and falls in the stock market.

49.    In or around February of 1982, Plaintiff John Doe was living and working in Yuma, Arizona, when he began to feel the sensation of lasers on the left side of his head. These lasers were invisible and were being directed at Plaintiff John Doe from somewhere in space. The sensations started off gentle but within a few days became aggressive and painful. These sensations occurred both indoors and outdoors.

50.    On information and belief, Plaintiff John Doe alleges that the individuals remotely operating the space-to-ground lasers were well practiced experts at what they were doing. The individuals operating the satellites could use the invisible, penetrating, satellite-to-ground electromagnetic beams to control human behavior. They could use their satellites to see right through the roof and walls, and into the heads and bodies of individuals and control many different types of behavior. Their capability to see into your home or other dwelling, no matter how thick the walls, was much better than with the naked eye.

51.    The individuals with the satellites could use invisible space-to-ground signals to control thought, speech, emotions, eye movement, temperament, head movement, bowel movement, urge to urinate, arm movement, finger movement,

COMPLAINT FOR NEGLIGENCE; GROSS NEGLIGENCE; IIED; ASSAULT; BATTERY; TRESPASS; STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES

and many other things. The satellites could be used to cause an individual to feel sleepy; cause impulsive behavior; cause an individual to feel restless and deprive that person of sleep; cause vertigo; cause confusion; block thinking ability; make individuals sweat profusely; cause pain; cause itching sensations; listen in on a person's thinking; cause individuals to stutter; cause driving accidents; cause errors in judgement; disrupt physiological homeostasis and cause a person to look or feel different; and many other things.

52.    Plaintiff John Doe joined the Marine Corps in December of 1982. In or around May of 1985, Plaintiff John Doe was given orders to transfer to the Marine Base in El Toro, California. Even after the move the satellites and lasers continued to track and assault Plaintiff John Doe in vicious and painful manners, frequently causing excruciating pain in different areas of John Doe's body.

53.    The actions and omissions of Defendant Lockheed Martin and their co-conspirators are responsible for the satellites and lasers which aggressively tracked and assaulted Plaintiff John Doe everywhere he traveled or was stationed. The Defendants and/or their co-conspirators engaged in this conduct around the clock every single day, which leads Plaintiff John Doe to believe these parties acted in rotating shifts.

54.    In or around January of 1986 the attacks by Defendants and/or co-conspirators were more profuse and included both painful assaults and also the controlling of Plaintiff John Doe's behavior and the behavior of those around him. This created a major disruption to Plaintiff John Doe's military career and livelihood.

55.    Shortly thereafter Plaintiff John Doe sought to speak with someone regarding his experiences, and visited a Base psychologist to discuss these events. As a result Plaintiff John Doe had a hearing with two high ranking officers.

56.    One of the officers asked Plaintiff John Doe if he had ever been in front of an A-6 Intruder Beacon, or any other type of beacon or satellite uplink and

whether Plaintiff John Doe was aware of these technologies. An A-6 Intruder is a jet airplane that has a satellite dish on its nose that sends out a powerful scattered beam which jams enemy radar.

57.    At the time of this meeting Plaintiff John Doe was unaware of these technologies and to his knowledge had not come into contact with them. Although the questioning officer advised further investigation into the matter, the other officer declared that there was no evidence such weapons existed.

58.    Plaintiff John Doe was eventually diagnosed with schizophrenia and forced to retire from the Marine Corps in June of 1988.

59.    Shortly after retiring Plaintiff John Doe visited the city library and found several books and articles containing extensive information about the technology whose effects he was experiencing and its development. One such book was titled, The Zapping of America, published in 1977 and authored by Paul Brodeur. Plaintiff John Doe wrote a letter to Paul Brodeur explaining his experiences, to which Brodeur responded that the weaponry Plaintiff John Doe had experienced, was developed by the United States.

60.    Plaintiff John Doe also discovered the book at the library titled "The Body Electric," which was published in 1985 by Robert O. Becker. Becker is a renowned expert in electromagnetism and electrophysiology and spoke extensively in this book about the technology that was being used against John Doe. In "The Body Electric," Becker said that, "Eventual monitoring of evoked potentials from the EEG, combined with radio frequency and microwave broadcasts designed to produce specific thoughts or moods, such as compliance and complacency, promises a method of mind control that poses immense danger to all societies - tyranny without terror."

61.    Over the years Plaintiff John Doe wrote many letters and placed some phone calls to high-ranking officials, complaining about the technology and what was happening to him.

COMPLAINT FOR NEGLIGENCE; GROSS NEGLIGENCE; IIED; ASSAULT; BATTERY; TRESPASS;
STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES

62.    In the 1990s, with the advent of the internet, Plaintiff John Doe found several forums and met with a dozen other people online who were experiencing the same intrusions on their lives from the satellite technology. Online this technology was referred to as "remote mind control," "direct energy weapons," "psychotronic weapons," and "electromagnetic weapons."

63.    One website in particular was called "The Mind Control Forum," and was run by a man by the name of Ed Light. Mr. Light, who has since disappeared, claimed the weapons were being used to destroy him and everything he had.

64.    Hereinafter, the Defendants and/or the Defendants' co-conspirators who became expert operators of the remote satellite control technology may be referred to as the "Controllers". Evidence shows that once the Controllers pick their open victim, they never leave that individual.

65.    The Controllers used "voice to skull" technology to communicate with Plaintiff John Doe. This technology was demonstrated in 1973 by Dr. Joseph Sharp of the Walter Reed Army Institute of Research and talked about in the book, The Zapping of America. It has been demonstrated in several well-known scientific experiments, and has been well publicized that the Controllers use this technology.

66.    The Controllers taunted Plaintiff John Doe, claiming to been in his house many times when he was just an adolescent. The Controllers further claimed to have used their remote control technology during that time to put Plaintiff John Doe into a deep sleep and cause him to be sexually molested. They also claim to have used this technology, to cause John Doe's adolescent cousin to be molested and her life ruined. These and other statements and actions by the Controllers have caused severe emotional distress to the Plaintiffs.

67.    The Controllers, which included Defendant Lockheed Martin, were obsessed with causing Plaintiffs to lose money and fail in the financial endeavors. They used this technology to stifle real estate purchases and sales, and to disrupt all

of the Plaintiff's businesses and investments. When the Plaintiffs invested in equities, the Controllers knew the direction that the investment would go beforehand and controlled the Plaintiffs' behavior, causing them to lose money.

68.    By the turn of the century, because of the Defendants' network of individuals using the satellite technology, Plaintiffs lost out on a great number of investments.

69.    In or around 2004, Defendant Lockheed Martin and/or its co-conspirators, using their precision behavior control, began a malicious and premeditated attack against the Plaintiffs and their personal wealth.

70.    In 2006, Plaintiff John Doe again wrote a letter to Senator Dianne Feinstein, Attorney General Holder, and other high ranking officials and complained to them about what was happening to him. Due to the lack of response, and comments made by the Controllers, Plaintiff John Doe began to believe that high ranking officials were involved in a cover-up of this technology. He also began to believe in earnest that the remote satellite-to-person technology was being used against him, in desperation, as to cause a physiological change that makes the Controllers and some associates look and feel smarter, younger, and more mature. Some of the Controllers associates benefiting from this technology are Congressmen and other high ranking officials.

71.    Defendant Lockheed Martin and its co-conspirators have spent billions of dollars weaponizing the technology inherent to the downlinks of communication, television, and radio satellites. Individuals are constantly being bombarded by minute invisible signals, including satellite and ground based electromagnetic signals from communications, cell phones, wireless internet devices, and radio and television signals.

72.    By concentrating the beam on the downlink of a television satellite such as the type used by Dish Networks, and adding tracking devices and other hardware and software, these satellites can be converted to space-to-ground

COMPLAINT FOR NEGLIGENCE; GROSS NEGLIGENCE; IIED; ASSAULT; BATTERY; TRESPASS;
STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES

weapons that deploy invisible, penetrating lasers of many different frequencies. A weapon of this sort could be used not only to kill or incapacitate a pilot of enemy aircraft, but also to kill or incapacitate any individual on the ground.

73.    Both the Justice Department, namely Attorney General Eric Holder, and many in Congress and other federal agencies are aware of the existence of these satellite weapons. In 2001 Representative Dennis J. Kucinich introduced the Space Preservation Act of 2001, which defined "weapons system" as including a device capable of "directing a source of energy (including electromagnetic radiation or ultra-low frequency radiation) against" an object. This Act sought to ban the type of weaponry being used against the defendants. The Act went on to state that this could be accomplished "through the use of land-based, sea-based, or space-based systems using radiation, electromagnetic, psychotronic, sonic, laser, or other energies directed at individual persons or targeted populations for the purpose of information war, mood management, or mind control of such persons or populations." The act confirmed to Plaintiff John Doe that some members of Congress were aware that these space based weapons truly did exist. Research shows that the Space Preservation Act did not go to vote by Congress because high ranking members of the military industrial complex were against it. The European Parliament also sought to ban these weapons.

## FIRST CAUSE OF ACTION FOR NEGLIGENCE

74.    Plaintiffs incorporate by reference as though fully set forth herein, each and every allegation set forth in paragraphs 13 through 73 of this Complaint.

75.    Plaintiff is informed and believes, and thereon alleges, that Defendant Lockheed Martin and its co-conspirators designed, deployed, maintained, and currently operates satellite technology capable of seeing beyond walls and into the minds and bodies of Plaintiffs, and is capable of remotely controlling the behavior of individuals.

///

COMPLAINT FOR NEGLIGENCE; GROSS NEGLIGENCE; IIED; ASSAULT; BATTERY; TRESPASS;
STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES

76.     Due to the potential dangers and inherent power of this satellite technology and the dangerous condition created by it, Defendant Lockheed Martin owed a duty of care to Plaintiffs to control this technology and prevent its use for illicit purposes, such as the harm suffered by Plaintiffs.

77.     Defendant Lockheed Martin breached the aforementioned duty by failing to warn Plaintiffs or the public at large and failing to control this technology and prevent its use for illicit purposes.

78.     Defendant Lockheed Martin's failure to responsibly maintain and restrict its technology for lawful purposes has resulted in physical, emotional, and economic injuries to Plaintiffs.

79.     As a proximate result of the acts alleged herein Plaintiffs suffered harm, entitling Plaintiffs to damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION FOR GROSS NEGLIGENCE

80.     Plaintiffs incorporate by reference as though fully set forth herein, each and every allegation set forth in paragraphs 13 through 79.

81.     In addition or in the alternative, Plaintiffs allege that Defendant Lockheed Martin is liable for gross negligence due to their extreme departure from the ordinary standard of conduct.

82.     Defendant Lockheed Martin consciously and/or deliberately engaged in reckless, willful, and wonton misconduct in failing to operate their surveillance satellite operations in such a way as to prevent harm to the general public, and to Plaintiffs specifically, by see-through-the-wall technology and space-to-ground electromagnetic weaponry.

83.     Defendant Lockheed Martin's failure to protect the public from its dangerous technology has proximately caused injury to Plaintiffs through physical, emotional, and economic damages.

84.     As a proximate result of the acts alleged herein Plaintiffs suffered harm, entitling Plaintiffs to damages in an amount to be proven at trial.

## THIRD CAUSE OF ACTION FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

85.     Plaintiffs incorporate by reference as though fully set forth herein, each and every allegation set forth in paragraphs 13 through 84.

86.     Defendant Lockheed Martin conspired to utilize technology which it knew could and would invade the lives and bodies of individuals such as Plaintiffs including taunting them through voice to skull communication, and helped to develop this technology primarily for remote mind control, constituting extreme and outrageous conduct.

87.     Defendant Lockheed Martin's conduct in conspiring to design, deploy, and operate this satellite technology was done with the intent of causing, or with reckless disregard for the probability of causing, emotional distress to Plaintiffs.

88.     As a direct result of Defendant Lockheed Martin's extreme and outrageous conduct in allowing their technology to invade the lives of and cause harm to Plaintiffs, Plaintiffs suffered severe and extreme emotional distress.

89.     As a proximate result of the acts alleged herein Plaintiffs suffered harm, entitling Plaintiffs to damages in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION FOR ASSAULT

90.     Plaintiffs incorporate by reference as though fully set forth herein, each and every allegation set forth in paragraphs 13 through 89.

91.     On multiple occasions and for many years Defendant Lockheed Martin used its satellite technology with the intent to cause imminent apprehension of contact from invisible lasers and from remote mind control technology.

92.     Due to prior painful encounters with these lasers and mind control technology, Plaintiffs suffered imminent apprehension of harm under the reasonable belief that they could be physically harmed by the electromagnetic lasers and/or remote mind control technology.

COMPLAINT FOR NEGLIGENCE; GROSS NEGLIGENCE; IIED; ASSAULT; BATTERY; TRESPASS; STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES

93.   As a proximate result of the acts alleged herein Plaintiffs suffered harm, entitling Plaintiffs to damages in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION FOR BATTERY

94.   Plaintiffs incorporate by reference as though fully set forth herein, each and every allegation set forth in paragraphs 13 through 93.

95.   Defendant Lockheed Martin caused Plaintiffs to be touched and/or tortured with invisible electromagnetic lasers with the intent to harm Plaintiffs.

96.   Plaintiffs did not consent to the touching or torturing.

97.   As a proximate result of the acts alleged herein Plaintiffs suffered harm, entitling Plaintiffs to damages in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION FOR TRESPASS

98.   Plaintiffs incorporate by reference as though fully set forth herein, each and every allegation set forth in paragraphs 13 through 97.

99.   Defendant Lockheed Martin and its co-conspirators used their satellite technology to intentionally trespass into Plaintiffs' real property and used remote mind control to destroy Plaintiffs' investments and wealth.

100.   Defendant Lockheed Martin and its co-conspirators trespass caused Plaintiffs' to suffer damages in the form of financial losses totaling over $5,000,000.

101.   As a proximate result of the acts alleged herein Plaintiffs suffered harm, entitled Plaintiffs to damages in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION FOR STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES

102.   Plaintiffs incorporate by reference as though fully set forth herein, each and every allegation set forth in paragraph 13 through 101.

103.   Defendant Lockheed Martin is a global weapons building behemoth and is the main entity on the planet which engineers, deploys, and maintains

sophisticated satellite surveillance technology enabling its operators to physically and emotionally torture individuals and manipulate their behavior.

104.   This technology poses the risk of, and is responsible for, invasions of privacy, remote mind control, and remote invisible assault and battery on a massive scale. This is affecting a multitude of individuals and in particular physically, emotionally, and economically harming Plaintiffs. This technology is being used to remotely displace others' important decisions and actions. Experts on this technology have warned of its extreme danger to the public.

105.   The lasers which physically harmed Plaintiffs and the remote mind control which caused Plaintiffs to suffer emotional and economical harm is precisely the type of harm that would be anticipated as a result of the risk created by Defendant Lockheed Martin in conspiring to develop and operate this type of satellite technology.

106.   The use of the satellite technology by Defendant Lockheed Martin and its co-conspirators was a substantial factor in causing harm to Plaintiffs.

107.   As a proximate result of the acts alleged herein Plaintiffs suffered harm, entitled Plaintiffs to damages in an amount to be proven at trial.

## JURY DEMAND

108.   Plaintiffs hereby demand a jury trial in this action.

## PRAYER

WHEREFORE, Plaintiffs pray for relief as follows:

1.   For actual, compensatory, and statutory damages according to proof;

2.   For special damages, including but not limited to, past, present and/or future wage loss, income and support, medical expenses and other special damages in a sum to be determined according to proof;

3.   For punitive damages as allowed by law;

4.   For pre and post-judgment interest as allowed by law;

5.   For injunctive relief;

COMPLAINT FOR NEGLIGENCE; GROSS NEGLIGENCE; IIED; ASSAULT; BATTERY; TRESPASS; STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES

6.    For an award of attorney fees as allowed by law;

7.    For such other and further relief as the Court deems just and proper.

Dated: May 16, 2015

**LAW OFFICES OF HAROLD W. DICKENS, III**

**By:** _____
        Harold W. Dickens, III
        Attorney for Plaintiff

COMPLAINT FOR NEGLIGENCE; GROSS NEGLIGENCE; IIED; ASSAULT; BATTERY; TRESPASS;
STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES